OPINION
{¶ 1} Defendant-Appellant Steven J. Walker appeals from his convictions and sentences in the Stark County Court of Common Pleas on one count of murder with a gun specification, in violation of R.C. 2903.02(A) and R.C. 2941.145 and one count of carrying a concealed weapon, a felony of the second degree in violation of R.C. 2923.12(A) (2). Plaintiff-Appellee is the State of Ohio.
 STATEMENT OF THE FACTS {¶ 2} Michael Cheek, Aubrey Williams, and Julius Edwards are longtime friends. They are also members of a Canton gang known as the "Northwest Shorb Block." On July 29, 2005, the three were hanging out with a fourth man, William Friedman, who was Cheek's cousin. The four spent the day together and were drinking when they made plans to go to a Canton bar called Brick City. (1t. AT 158-163; 202-206).
 {¶ 3} Mr. Williams drove the four in a Buick Regal car belonging to Michael Cheek's mother. They decided to go to the Hall of Fame Fuel Mart to buy new t-shirts before they went to the bar. The Hall of Fame Fuel Mart is located at 704 Sherrick Road S.E., Canton. Aubrey Williams waited in the car, and the other three entered the store. (Id. at 161-162; 164-166; 167; 206; 237).
 {¶ 4} The City of Canton is divided into roughly four gang "territories." The northwest part of the city is known as the territory of "Northwest Shorb Block." The northeast quadrant is known as the-home of the "Crypts" (sic). The southwest and southeast portions of the city are "Rated," or "Rated R," territory. The Hall of Fame Fuel Mart is located in what is considered to be "Rated" territory. (Id. at 177; 183).
 {¶ 5} Inside the store, Michael Cheek, Julius Edwards, and William Friedman encountered appellant Steven Walker. Appellant was at one of the store's two cash registers, arguing with clerk Hussin Almuzerwi over the price of a shirt. A verbal confrontation ensued between appellant and Cheek's group. In the words of Julius Edwards, "We got out of the car and go in the store, we see Stevie, you know, in there hollering, talking about Rated." (1T. at 209). In Edwards' estimation, appellant was "letting it be known" that he was "Rated, flat-out." (Id. at 210-248).
 {¶ 6} The group selected and paid for their t-shirts as the verbal back-and-forth with appellant continued. The tension escalated. Edwards described appellant as relentlessly baiting the three: "he's still walking up on it." (1T. at 211). At this point, Michael Cheek had enough and told Edwards that he was going to hit appellant. (Id. at 209-212). Mr. Cheek proceeded to strike appellant, knocking him into a candy rack. Appellant fell to the ground. (Id. at 212; 230; 240; 245; 248).
 {¶ 7} Cheek, Friedman, and Edwards hurried out of the store. Edwards looked back at appellant and saw him reaching for something. Clerk Hussin Almuzerwi also saw appellant reach for something at his waist. Julius Edwards described what he saw as a "burner," a gun or pistol. Cheek, Edwards, and Friedman took off running. Cheek ran in the direction of the Southeast Community Center, and Edwards and Friedman ran toward the car. (1T. at 211; 213-214; 239-240; 245).
 {¶ 8} Julius Edwards testified that appellant ran out of the store "with the burner already out" and fired at least four to five times at Michael Cheek as he fled. Cheek fell to the ground. Appellant pointed the gun at Edwards and Friedman; Edwards said that the gun "clicked." Appellant got into his own car and left the scene. (1T. at 211; 213-215; 218).
 {¶ 9} Mr. Edwards admitted that he is a member of the Shorb Block gang but claimed that Williams, Cheek, and Friedman were not. He also claimed not to know whether appellant was affiliated with any gang. (1T. at 202-203).
 {¶ 10} Julius Edwards did identify appellant as the shooter. He stated that appellant had people "with" him, presumably in his car. (1T. at 215; 216-217).
 {¶ 11} Mr. Edwards also testified that no one in Michael Cheek's group that night had a gun. (1T. at 217).
 {¶ 12} Aubrey Williams watched the shooting from the driver's seat of the car. Cheek, Friedman, and Edwards had been in the store only about five minutes when Cheek came running out and turned left. He was followed by Edwards and then Friedman, who turned right, toward the car. Williams saw appellant come out after the group, pointing a gun at Cheek. (1T. at 168-169).
 {¶ 13} Cheek got about fifteen or twenty feet from the door of the store when appellant fired the gun and Cheek dropped to the ground. Williams recalled that appellant fired the gun more than once but he was not sure how many times. Williams saw appellant get into a black Taurus and drive away. (1T. at 169-170; 174). Mr. Williams testified that no one in the Buick Regal that night had a gun. He identified appellant as the person who shot Michael Cheek, and testified that there was no doubt in his mind that appellant was the shooter. (1T. at 173-174).
 {¶ 14} Both Williams and Edwards described the final moments of the life of Michael Cheek. They ran to their friend as he lay on the ground. Cheek told them that he couldn't feel his legs. Williams, Edwards, and Friedman tried to pick up Cheek in an attempt to carry him to the car, but bystanders advised them not to move him. Cheek stated that he could not feel his body anymore. Williams placed his hand under Cheek's head as Cheek coughed and his eyes rolled back into his head. (1T. at 170; 215-216; 217).
 {¶ 15} Emergency medical personnel and police arrived. Patrolman Michael Nordick lifted Cheek from the large pool of blood in which he lay, and noted an entrance wound in his back. (1T. at 125-126).
 {¶ 16} Cheek was transported to Aultman Hospital. Edwards and Williams also went to Aultman and were told that Cheek was dead. (1T. at 173; 216).
 {¶ 17} Patrolman Nordick questioned Edwards at the hospital, and Edwards told him that appellant was the shooter. (1T. at 128; 216).
 {¶ 18} Patrolman Nordick examined the scene of the murder and discovered two baggies of crack cocaine. One was inside the Cheek vehicle, on the driver's side rear passenger floorboard. The other was underneath the vehicle. Julius Williams testified that no one that night had smoked any crack cocaine; the crack was intended for "distribution." Williams said that he had both bags and threw them in the aftermath of the shooting. He knew that one went underneath the car, but did not know the location of the second baggie. (1T. at 132; 171-172).
 {¶ 19} No firearms or other weapons were found at the crime scene. No firearms or other weapons were found in the car owned by Cheek's mother and driven by Williams on the night of the murder. (1T. at 134; 262).
 {¶ 20} Inside the Hall of Fame Fuel Mart, Detective Curtis Floyd noted that a rack of candy and chips was overturned and its contents spilled all over the store. (1T. at 258).
 {¶ 21} Detective Kevin Clary of the Canton Police Department's I.D. Bureau arrived at the Hall of Fame Fuel Mart and found the crime scene cordoned off. He proceeded to photograph the scene, including spent shell casings, pools of blood, and contraband (the crack cocaine). He also created a diagram mapping where the evidence was found. (1T. at 138; 140).
 {¶ 22} Detective Clary noted four spent shell casings, along the edge of the store building, from the front door eastward. He photographed the Buick Regal, which was parked by the store's front door, and noted one large pool of blood where emergency medical personnel had worked on Cheek. Sixty feet east of that were two smaller pools of blood. East of the lot of the Hall of Fame Mart is a grassy backyard area, the first house east of the store. Parked in that lot was a red Lincoln Continental which had been struck by a bullet. Detective Clary collected the bullet. (1T. at 139-140; 143-144; 146).
 {¶ 23} Detective Clary also collected the crack cocaine. Finally, he went to Aultman Hospital and collected the clothing that Cheek had been wearing. (1T. at 147-151).
 {¶ 24} Criminalist Michael Short of the Stark County Crime Lab received and analyzed the physical evidence.
 {¶ 25} Short explained that spent bullets can be examined to determine whether they were fired from the same gun. The bullets are compared with a 2-stage comparison microscope through which the criminalist examines the breech face marks, firing pin indents, and ejector and extractor marks. Two .9 millimeter bullets were extracted from the body of Michael Cheek. Upon comparison, Short determined that these bullets were consistent with having been fired from the same gun. (1T. at 271-273; 277-278; 281).
 {¶ 26} Furthermore, the rifling characteristics on the bullets led him to conclude that the gun in question was a Beemiller Inc. Hi-Point Firearms .9 millimeter pistol. (1T. at 277-278).
 {¶ 27} Short also examined four spent .9 millimeter shell casings which had been collected from the sidewalk in front of the Hall of Fame Mart. Those four shell casings were all fired from the same gun. Moreover, the bullets extracted from the body of Michael Cheek would fit inside those shell casings. (1T. at 280-81).
 {¶ 28} Ultimately, Short concluded, the four casings and the two bullets were all fired from the same gun. He was unable to determine whether the bullet which was found in the Lincoln Continental was also fired by that gun because it had passed through metal and the surface was too damaged. (1T. at 281; 282).
 {¶ 29} Short also described tests that can be done to determine whether there is gunshot residue on an item. The "muzzle-to-garment distance" means the distance from the muzzle of a firearm to the item that has been shot. Short would not expect to find gunshot residue on the clothing of someone who was outside a particular firearm's muzzle-to-garment distance when they were shot. (1T. at 274).
 {¶ 30} In this case, the muzzle-to-garment distance of the Hi-Point .9 millimeter is approximately four to four and a half feet. Michael Cheek's white t-shirt, undershirt, and blue denim shorts were examined and no gunshot residue was found. Swabs from Cheek's gunshot wounds were examined and no gunshot residue was found. From these facts, Short determined that Cheek was outside the muzzle-to-garment distance of the Hi-Point .9 millimeter when the gun was fired. (1T. at 284-294).
 {¶ 31} Deputy Stark County Coroner Artemio Orlino performed an autopsy on the body of Michael Cheek to determine the cause of death. Dr. Orlino observed two gunshot wounds: one in Cheek's right lower back, and the other in his right buttock. Both wounds were entrance wounds; the bullets did not exit Cheek's body. (2T. at 314).
 {¶ 32} Dr. Orlino traced the path of the bullets. Gunshot wound number one entered through the right lower back, shattered part of a vertebra, shattered the upper part of the right kidney, went through the right lobe of the liver, and proceeded through the right leaf of the diaphragm into the middle lobe of the right lung. The bullet lodged in the right anterior chest muscle. (2T. at 317-318).
 {¶ 33} Gunshot wound number two entered through the right buttock, went through the pelvis, and nicked the right wall of the bladder. The bullet was discovered lying freely in the belly. (2T. at 318).
 {¶ 34} The trajectory of gunshot wound number one was back to front, slightly right to left, and upward. Gunshot wound number two was also back to front and upward. (2T. at 318-319).
 {¶ 35} The internal autopsy showed that Cheek died from a massive hemorrhage within his right chest cavity which was caused by the bleeding of organs struck by gunshot wound number one. The death certificate lists the cause of death as gunshot wound with massive blood loss, and the coroner ruled that the death was a homicide. (2T. at 323-325).
 {¶ 36} No soot or stippling marks from gunpowder were found in either gunshot wound. In Dr. Orlino's opinion, the gun was fired from more than two or three feet away. The microscopic exams did not reveal any evidence of close-contact gunshot wounds. (2T. at 321-322).
 {¶ 37} At the conclusion of the jury trial and appellant was found guilty as charged. The trial court sentenced appellant to an aggregate prison term of eighteen years to life.
 {¶ 38} It is from these convictions and sentences that the appellant has timely appealed raising the following three assignments of error:
 {¶ 39} "I. THE APPELLANT WAS DENIED A FAIR TRIAL DUE TO THE TRIAL COURT'S REFUSAL TO ALLOW THE DEFENSE TO PRESENT EVIDENCE REGARDING A PRIOR SHOOTING.
 {¶ 40} "II. THE APPELLANT WAS DENIED A FAIR TRIAL DUE TO IMPROPER COMMENTS BY THE PROSECUTOR DURING CLOSING ARGUMENT.
 {¶ 41} "III. THE APPELLANT'S CONVICTION WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."
 I. {¶ 42} In his first assignment of error appellant maintains that the trial court should have permitted him to present evidence of a shooting which occurred approximately 28 minutes prior to the shooting of Michael Cheek. We disagree.
 {¶ 43} The admission or exclusion of evidence rests in the sound discretion of the trial court. State v. Sage (1987),31 Ohio St.3d 173, 180, 510 N.E.2d 343. Our task is to look at the totality of the circumstances in the particular case under appeal, and determine whether the trial court acted unreasonably, arbitrarily or unconscionably in allowing or excluding the disputed evidence. State v. Oman (Feb. 14, 2000), Stark App. No. 1999CA00027. As a general rule, all relevant evidence is admissible. Evid.R. 402.
 {¶ 44} In the case at bar, appellant sought to introduce evidence that the decedent and his friends allegedly shot at Glenn Carter while Mr. Carter was sitting on the porch of his home. (2T. at 338). A police report was filed concerning this incident which occurred less than one-half hour before Mr. Cheek was shot. (Id. at 338-339). Five spent .380 casing were recovered from the street in front of the home. (Id.). The purpose of this evidence, according to appellant, was to show that other gunfire may have occurred at the time Mr. Cheek was shot, and potentially that someone other than appellant fired the fatal shots. (Id. at 339; 342). The defense sought to introduce the police reports and the testimony of Mr. Carter. (Id. at 339; 343).
 {¶ 45} The trial court ruled that the evidence was too speculative and that any probative value was substantially outweighed by the danger of unfair prejudice. (2T. at 334-335).
 {¶ 46} Every criminal defendant has a constitutional right to present a meaningful defense. Crane v. Kentucky (1986),476 U.S. 683, 690, 106 S.Ct. 2142. However, this right does not engender an unfettered entitlement to the admission of any and all evidence. U.S. v. Scheffer (1998), 523 U.S. 303, 308,118 S.Ct. 1261.
 {¶ 47} "While the Constitution thus prohibits the exclusion of defense evidence under rules that serve no legitimate purpose or that are disproportionate to the ends that they are asserted to promote, well-established rules of evidence permit trial judges to exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury. See, e.g., Fed. Rule Evid. 403; Uniform Rule of Evid. 45 (1953); ALI, Model Code of Evidence Rule 303 (1942); 3 J. Wigmore, Evidence §§ 1863,1904 (1904). Plainly referring to rules of this type, we have stated that the Constitution permits judges `to exclude evidence that is `repetitive . . ., only marginally relevant' or poses an undue risk of `harassment, prejudice, [or] confusion of the issues.' Crane, supra, at 689-690, 106 S.Ct. 2142 (quotingDelaware v. Van Arsdall, 475 U.S. 673, 679, 106 S.Ct. 1431,89 L.Ed.2d 674 (1986); ellipsis and brackets in original). See alsoMontana v. Egelhoff, 518 U.S. 37, 42, 116 S.Ct. 2013,135 L.Ed.2d 361 (1996) (plurality opinion) (terming such rules "familiar and unquestionably constitutional").
 {¶ 48} "A specific application of this principle is found in rules regulating the admission of evidence proffered by criminal defendants to show that someone else committed the crime with which they are charged. See, e.g., 41 C.J.S., Homicide § 216, pp. 56-58 (1991) (`Evidence tending to show the commission by another person of the crime charged may be introduced by accused when it is inconsistent with, and raises a reasonable doubt of, his own guilt; but frequently matters offered in evidence for this purpose are so remote and lack such connection with the crime that they are excluded'); 40A Am.Jur.2d, Homicide § 286, pp. 136-138 (1999) (`[T]he accused may introduce any legal evidence tending to prove that another person may have committed the crime with which the defendant is charged. . . . [Such evidence] may be excluded where it does not sufficiently connect the other person to the crime, as, for example, where the evidence is speculative or remote, or does not tend to prove or disprove a material fact in issue at the defendant's trial' (footnotes omitted)). Such rules are widely accepted, and neither petitioner nor his amici challenge them here". Holmes v. SouthCarolina (2006), 547 U.S. ___, 126 S.Ct. 1727, 1732-1733. [Footnotes omitted].
 {¶ 49} However, "when a defendant wishes to implicate a specific individual, evidence of the third party's guilt is admissible only if the defense can produce evidence that `tend[s] to directly connect such other person with the actual commission of the crime charged'". Smithart v. Alaska (1999),988 P.2d 583, 586. [Footnotes and citations omitted].
 {¶ 50} "There is no requirement that the proffered evidence must prove or even raise a strong probability that someone other than the defendant committed the offense. Rather, the evidence need only tend to create a reasonable doubt that the defendant committed the offense. In this regard, our focus is on the effect the evidence has upon the defendant's culpability, and not the third party's culpability". Johnson v. United States (DC CA 1989), 552 A.2d 513, 516. [Emphasis in original].
 {¶ 51} In the case at bar, for the evidence that the decedent and/or his friends were armed to be relevant, it must show a connection between that fact and the crime charged, and thereby tend to create a reasonable doubt that appellant killed Mr. Cheek. Johnson v. United States, supra. Likewise, the probative value of the evidence must outweigh any tendency to create undue prejudice. Id.
 {¶ 52} In the case at bar, appellant acknowledged that he was not aware of the shooting incident involving Glen Carter. Appellant conceded that he was not arguing self-defense and that his state of mind was not relevant to the admission of the prior shooting incident. (1T. at 8; 2T. at 341).
 {¶ 53} The court afforded appellant ample opportunity to present and proffer evidence in order to establish a nexus between the shooting of Mr. Cheek and the prior shooting incident. (1T. at 4-10; 2T. at 337-346). The court found no nexus between the proffered evidence and the murder of Michael Cheek. We find no fault with the trial court's reasoning. The record is devoid of any evidence directly linking the inference that the decedent and/or his friends may have been armed to the murder of Michael Cheek. At best appellant sought to introduce evidence which simply affords a possible ground of possible suspicion against another person.
 {¶ 54} The exclusion of the evidence in question based upon considerations of relevance and confusion did not constitute a misapplication of the rules of evidence or a violation of appellant's constitutional rights. State v. Miller, 12th
Dist. No. CA2005-02-04, 2006-Ohio-2799 at ¶ 30.
 {¶ 55} Appellant's first assignment of error is overruled.
 II. {¶ 56} In his second assignment of error, appellant maintains that during the rebuttal portion of closing argument the prosecutor committed prosecutorial misconduct by arguing that the appellant knew the identity of the other individuals who were in the car with him at the time of the shooting and that appellant failed to call those individuals as witnesses to support appellant's argument that he did not shoot Mr. Cheek. We disagree.
 {¶ 57} Appellant did not object to the comment to which he now claims error. Therefore, we must find plain error in order to reverse.
 {¶ 58} Crim.R. 52(B) provides that, "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." "Notice of plain error under Crim.R. 52(B) is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." State v. Long (1978),53 Ohio St.2d 91, paragraph three of the syllabus. In order to find plain error under Crim.R. 52(B), it must be determined, but for the error, the outcome of the trial clearly would have been otherwise. Id. at paragraph two of the syllabus.
 {¶ 59} In U.S. v. Dominguez Benitez (June 14, 2004), 524 U.S. 74,124 S.Ct. 2333, the Court defined the prejudice prong of the plain error analysis. "It is only for certain structural errors undermining the fairness of a criminal proceeding as a whole that even preserved error requires reversal without regard to the mistake's effect on the proceeding. See Arizona v.Fulminante, 499 U.S. 279, 309-310 (1991) (giving examples).
 {¶ 60} "Otherwise, relief for error is tied in some way to prejudicial effect, and the standard phrased as `error that affects substantial rights,' used in Rule 52, has previously been taken to mean error with a prejudicial effect on the outcome of a judicial proceeding. See Kotteakos v. United States,328 U.S. 750 (1946). To affect "substantial rights," see 28 U.S.C. § 2111, an error must have "substantial and injurious effect or influence in determining the . . . verdict." Kotteakos, supra, at 776." Id. at 2339. See, also, State v. Barnes (2002),94 Ohio St.3d 21, 759 N.E.2d 1240.
 {¶ 61} The defendant bears the burden of demonstrating that a plain error affected his substantial rights. United States v.Olano (1993), 507 U.S. at 725,734, 113 S.Ct. 1770; State v.Perry (2004), 101 Ohio St.3d 118, 120, 802 N.E.2d 643, 646. Even if the defendant satisfies this burden, an appellate court has discretion to disregard the error and should correct it only to `prevent a manifest miscarriage of justice.'" State v. Barnes
(2002), 94 Ohio St.3d 21, 27, 759 N.E.2d 1240, quoting State v.Long (1978), 53 Ohio St.2d 91, 372 N.E.2d 804, paragraph three of the syllabus. Perry, supra, at 118, 802 N.E.2d at 646.
 {¶ 62} A prosecutor is entitled to a certain degree of latitude in closing arguments. State v. Liberatore (1982),69 Ohio St.2d 583, 589, 433 N.E.2d 561. Thus, it falls within the sound discretion of the trial court to determine the propriety of these arguments. State v. Maurer (1984), 15 Ohio St.3d 239,269, 473 N.E.2d 768. A conviction will be reversed only where it is clear beyond a reasonable doubt that, absent the prosecutor's comments, the jury would not have found the defendant guilty.State v. Benge, 75 Ohio St.3d 136, 141, 1996-Ohio-227. Furthermore, "[i]solated comments by a prosecutor are not to be taken out of context and given their most damaging meaning."Donnelly v. DeChristoforo (1974), 416 U.S. 637, 647,94 S.Ct. 1868, 40 L.Ed.2d 431.
 {¶ 63} The state may comment upon a defendant's failure to offer evidence in support of its case. State v. Collins (2000),89 Ohio St.3d 524, 733 N.E.2d 1118. "Such comments do not imply that the burden of proof has shifted to the defense, nor do they necessarily constitute a penalty on the defendant's exercise of his Fifth Amendment right to remain silent." Id. at 528-29,733 N.E.2d 1118. The state must refrain from commenting on a decision not to testify, but the state may challenge the weight of evidence offered by the defense in support of its theory of the case. Id. The state does not have a duty to disprove every possible circumstance suggested by the defendant. Id.
 {¶ 64} "[T]he fact that one of the parties fails to call a witness who has some knowledge of the matter under investigation may be commented upon." State v. Petro (1948),148 Ohio St. 473, 498, 162, 76 N.E.2d 355, 367; State v. Champion (1924),109 Ohio St. 281, 289-290, 142 N.E. 141, 143-144. State v.D'Ambrosio (1993), 67 Ohio St.3d 185, 193, 1993-Ohio-170, 616 N.E.2d 909,916.
 {¶ 65} In State v. Clemons the Ohio Supreme Court stated; "[t]he comment that the defense did not call an expert to testify that defendant "blacked out" during proceedings is not error. The comment that a witness other than the accused did not testify is not improper, State v. D'Ambrosio (1993), 67 Ohio St.3d 185,193, 616 N.E.2d 909, 916, since the prosecution may comment upon the failure of the defense to offer evidence in support of its case. State v. Williams (1986), 23 Ohio St.3d 16, 19-20,23 OBR 13, 16-17, 490 N.E.2d 906, 910-911; State v. Bies (1996),74 Ohio St.3d 320, 326, 658 N.E.2d 754, 760." Clemons, supra,82 Ohio St.3d 438, 452, 1998-Ohio-452, 692 N.E.2d 1009, 1022.
 {¶ 66} The appellant in the case at bar mischaracterizes the prosecutor's statements. The prosecutor was commenting on the lack of evidence and not on the fact that appellant had not testified, or presented a defense.
 {¶ 67} Appellant's trial counsel first raised the topic in closing argument:
 {¶ 68} "* * *
 {¶ 69} "There is no doubt that what you heard and what you saw from Aubrey Williams and Julius Edwards I believe, that you looking at this, could conclude that you were lied to. And the Judge is going to instruct you with respect to how you handle lies and how you handle the people that lie to you.
 {¶ 70} "Now, let's talk a little bit about the missing people. I believe we heard from Aubrey Williams and Julius Edwards that there were people in the car with Steven. Where are they? We heard from Aubrey Williams and Julius Edwards that there was another gentleman with them, a guy that was actually just locked up and had just gotten out, Peanut . . ." (2T. at 378-379). In rebuttal the prosecuting attorney made the following statement:
 {¶ 71} "* * *
 {¶ 72} "And only one person in this courtroom knows who was in that car with him, and it's Steven Walker. So where are they? Don't ask us because we don't know who it was. But if you didn't commit a murder, wouldn't you be telling those people, hey, you three people are going to come in and say I didn't have a gun. Don't ask us who was in that car because we don't know". (2T. at 378-379).
 {¶ 73} Appellant cannot complain of an error that he invited. Moreover, the trial court instructed the jury that it must decide the case on the evidence and that opening statements and closing arguments are not evidence. We presume that the jury followed the court's instructions. State v. Loza (1994), 71 Ohio St.3d 61,79, 641 N.E.2d 1082.
 {¶ 74} We find that the language used by the prosecutor in this case is not such that the jury would "naturally and necessarily" take it as comment on the failure of the accused to testify, or to present a defense and thus fails the test set forth in State v. Cooper (1977), 52 Ohio St.2d 163,370 N.E.2d 725, vacated on other grounds (1978), 438 U.S. 911,98 S.Ct. 3137, 57 L.Ed.2d 1157. State v. Williams (1986),23 Ohio St.3d 16, 20, 490 N.E.2d 906, 911.
 {¶ 75} Appellant's second assignment of error is overruled.
 III. {¶ 76} In his third assignment of error, appellant maintains that his conviction for Murder and Carrying a Concealed Weapon are against the weight of the evidence. We disagree.
 {¶ 77} The Supreme Court has explained the distinction between claims of sufficiency of the evidence and manifest weight.
 {¶ 78} Sufficiency of the evidence is a question of law for the trial court to determine whether the State has met its burden to produce evidence on each element of the crime charged, sufficient for the matter to be submitted to the jury. A claim that evidence is insufficient to support a conviction as a matter of due process depends on "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia (1979), 443 U.S.307, 319, 99 S.Ct. 2781, 2789. (Emphasis in original).
 {¶ 79} Manifest weight of the evidence claims concern the amount of evidence offered in support of one side of the case, and is a jury question. We must determine whether the jury, in interpreting the facts, so lost its way that its verdict results in a manifest miscarriage of justice, State v. Thompkins
(1997), 78 Ohio St. 3d 387, citations omitted. On review for manifest weight, a reviewing court is "to examine the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses and determine whether in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed. The discretionary power to grant a new hearing should be exercised only in the exceptional case in which the evidence weighs heavily against the judgment."State v. Thompkins, 78 Ohio St.3d 380, 387, 1997-Ohio-52, citing State v. Martin (1983), 20 Ohio App.3d 172, 175. Because the trier of fact is in a better position to observe the witnesses' demeanor and weigh their credibility, the weight of the evidence and the credibility of the witnesses are primarily for the trier of fact. State v. DeHass (1967),10 Ohio St.2d 230, syllabus 1.
 {¶ 80} In State v. Thompkins (1997), 78 Ohio St.3d 380,678 N.E.2d 541, the Ohio Supreme Court held "[t]o reverse a judgment of a trial court on the basis that the judgment is not sustained by sufficient evidence, only a concurring majority of a panel of a court of appeals reviewing the judgment is necessary." Id., paragraph three of the syllabus. However, to "reverse a judgment of a trial court on the weight of the evidence, when the judgment results from a trial by jury, a unanimous concurrence of all three judges on the court of appeals panel reviewing the case is required." Id., paragraph four of the syllabus; State v. Miller
(2002), 96 Ohio St.3d 384, 2002-Ohio-4931 at ¶ 38,775 N.E.2d 498.
 {¶ 81} In the case at bar, appellant was convicted of the offense of murder, with a firearm specification in violation of R.C. 2903.02(A), which states: "No person shall purposely cause the death of another * * *."
 {¶ 82} Appellant was also charged with one count of carrying a concealed weapon in violation of R.C. 2923.12(A)(2) which states: "[n]o person shall knowingly carry or have concealed on the person's person or concealed ready at hand, any one of the following: . . . (2) [a] handgun other than a dangerous ordinance. . . ."
 {¶ 83} To find the appellant guilty of Murder as charge in the case at bar, the jury would have to find that the appellant purposely caused the death of another.
 {¶ 84} R.C. 2901.22 Culpable mental states, provides:
 {¶ 85} "(A) A person acts purposely when it is his specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is his specific intention to engage in conduct of that nature."
 {¶ 86} "Intent need not be proven by direct testimony. Statev. Lott (1990), 51 Ohio St.3d 160, 168, 555 N.E.2d 293, 302. Instead, intent to kill `may be deduced from all the surrounding circumstances, including the instrument used to produce death, its tendency to destroy life if designed for that purpose, and the manner of inflicting a fatal wound.' State v. Robinson
(1954), 161 Ohio St. 213, 53 O.O. 96, 118 N.E.2d 517, at paragraph five of the syllabus; State v. Eley (1996),77 Ohio St.3d 174, 180, 672 N.E.2d 640, 648". State v. Stallings
(2000), 89 Ohio St.3d 280, 290, 2000-Ohio-159, 731 N.E.2d 159,171.
 {¶ 87} The specific intent to kill may be reasonably inferred from the fact that a firearm is an inherently dangerous instrument, the use of which is likely to produce death. Statev. Mackey (1999), Cuyahoga App. No. 75300, dismissed, appeal not allowed (2000), 88 Ohio St.3d 1496, 727 N.E.2d 920, citing Statev. Widner (1982), 69 Ohio St.2d 267, 431 N.E.2d 1025 (finding purpose to kill in passenger's firing gun at individual from moving vehicle); State v. Dunlap (1995), 73 Ohio St.3d 308,316, 652 N.E.2d 988, certiorari denied (1996), 516 U.S. 1096,116 S.Ct. 1096, 133 L.Ed.2d 765. State v. Banks, 10th Dist. No. 01 AP-1179, 2002-Ohio-3341 at ¶ 24.
 {¶ 88} "[T]he act of pointing a firearm and firing it in the direction of another human being is an act with death as a natural and probable consequence." State v. Turner (1997), Franklin App. No. 97APA05-709, dismissed, appeal not allowed (1998), 81 Ohio St.3d 1496, 691 N.E.2d 1058 (finding sufficient evidence of intent to kill in firing a gun from an automobile at a group of individuals), quoting State v. Brown (1996), Cuyahoga App. No. 68761, dismissed, appeal not allowed,77 Ohio St.3d 1468, 673 N.E.2d 135; see, also, State v. Smith (1993),89 Ohio App.3d 497, 501, 624 N.E.2d 1114 (finding that pointing gun at a group of people less than twenty feet away and shooting at least one shot could be used by the trier of fact as proof of intention to kill). Banks, supra, at ¶ 26.
 {¶ 89} With respect to the murder and carrying a concealed weapon charges, the state presented testimony from three eyewitnesses.
 {¶ 90} Aubrey Williams watched the shooting from the driver's seat of the car. Williams saw appellant come out after the group, pointing a gun at Cheek. (1T. at 168-169). Cheek got about fifteen or twenty feet from the door of the store when appellant fired the gun and Cheek dropped to the ground. Williams recalled that appellant fired the gun more than once but he was not sure how many times. (Id. at 169-170, 174). Mr. Williams testified that he saw fire come out of the end of the gun. (Id. at 190). He then saw appellant get into a black Taurus and drive away. (Id. at 169-170, 174).
 {¶ 91} Juluis Edwards testified that he, Cheek, and Friedman hurried out of the store. Edwards looked back at appellant and saw him reaching for something. Clerk Hussin Almuzerwi also saw appellant reach for something at his waist. Edwards described what he saw as a "burner," a gun or pistol. Cheek, Edwards, and Friedman took off running. Cheek ran in the direction of the Southeast Community Center, and Edwards and Friedman ran toward the car. (1T. at 211; 213-214; 239-40; 245).
 {¶ 92} Edwards testified that appellant ran out of the store "with the burner already out" and fired at least four to five times at Cheek as he fled. Cheek fell to the ground. Appellant pointed the gun at Edwards and Friedman; Edwards said that the gun "clicked." Appellant got into his own car and left. (1T. at 211; 213-215; 218).
 {¶ 93} The store clerk, Husin Almuzerwi saw appellant reach for something in his waistband, watched him run outside behind Mr. Cheek, heard about four shots, and saw Mr. Cheek fall to the ground. (1T. at 239-240; 245-246; 248-250). Appellant was the only person who fled the parking lot in a hurry. (Id. at 274). Mr. Almuzerwi's discomfort and hesitation at trial was evident; he stated that both Cheek and appellant were regular customers, yet claimed to be unable to identify appellant in the courtroom. (1T. at 243-244; 249-250). Mr. Almuzerwi said that appellant was about six feet behind Cheek when Cheek fell. (Id. at 251).
 {¶ 94} Michael Short of the Stark County Crime Lab hypothesized that the firearm which fired the fatal shots was a Hi-Point .9 millimeter firearm. The muzzle-to-garment ratio of such a weapon, depending upon the length of the barrel, is four to four and a half feet. In other words, Short would expect to find gunshot residue on the clothing of anyone within three and a half to four and a half feet of the barrel of the gun when it was fired. No gunshot residue was found on Cheek's white t-shirt; hence, Cheek was outside the muzzle-to-garment distance of a .9 millimeter Hi-Point weapon. (1T. at 288-294). The deputy coroner testified that Cheek was a greater distance away than 2 or 3 feet because there was no evidence of gunpowder "stippling" in Cheek's wounds. (2T. at 321-322).
 {¶ 95} Viewing this evidence in a light most favorable to the prosecution, we conclude that a reasonable person could have found beyond a reasonable doubt that a murder, with a firearm specification and a carrying a concealed weapon had occurred. Viewing this evidence linking appellant to the murder of Mr. Cheek in a light most favorable to the prosecution, we conclude that a reasonable person could have found beyond a reasonable doubt that appellant had committed the crimes of murder, with a firearm specification and carrying a concealed weapon.
 {¶ 96} We hold, therefore, that the state met its burden of production regarding each element of the crimes of murder, including the firearm specification and carrying a concealed weapon and, accordingly, there was sufficient evidence to support appellant's convictions.
 {¶ 97} Although appellant testified that the decedent and his friends were members of a rival gang, had a significant amount of crack cocaine in their possession at the time of the incident, and it was possible that some unidentified person actually fired the fatal shot, the trier of fact was free to accept or reject any and all of the evidence offered by the appellant and assess the witness's credibility. "While the jury may take note of the inconsistencies and resolve or discount them accordingly * * * such inconsistencies do not render defendant's conviction against the manifest weight or sufficiency of the evidence". State v.Craig (Mar. 23, 2000), Franklin App. No. 99AP-739, citing Statev. Nivens (May 28, 1996), Franklin App. No. 95APA09-1236 Indeed, the jurors need not believe all of a witness' testimony, but may accept only portions of it as true. State v. Raver, Franklin App. No. 02AP-604, 2003-Ohio-958, at ¶ 21, citing State v.Antill (1964), 176 Ohio St. 61, 67, 197 N.E.2d 548.; State v.Burke, Franklin App. No. 02AP-1238, 2003-Ohio-2889, citingState v. Caldwell (1992), 79 Ohio App.3d 667, 607 N.E.2d 1096. Although the evidence may have been circumstantial, we note that circumstantial evidence has the same probative value as direct evidence. State v. Jenks (1991), 61 Ohio St. 3d 259,574 N.E. 2d 492.
 {¶ 98} In Seasons Coal Co. v. Cleveland (1984),10 Ohio St.3d 77, 81, 461 N.E.2d 1273, the Ohio Supreme Court explained: "[a] reviewing court should not reverse a decision simply because it holds a different opinion concerning the credibility of the witnesses and evidence submitted before the trial court. A finding of an error in law is a legitimate ground for reversal, but a difference of opinion on credibility of witnesses and evidence is not." See, also State v. DeHass (1967),10 Ohio St.2d 230, syllabus 1.
 {¶ 99} As an appellate court, we neither weigh the evidence nor judge the credibility of witnesses. Our role is to determine whether there is relevant, competent and credible evidence upon which the fact finder could base its judgment. Cross Truck v.Jeffries (February 10, 1982), Stark App. No. CA-5758. Accordingly, a judgment supported by competent, credible evidence going to all the essential elements of the case will not be reversed as being against the manifest weight of the evidence.C.E. Morris Co. v. Foley Constr. (1978), 54 Ohio St. 2d 279,376 N.E. 2d 578.
 {¶ 100} We conclude the trier of fact, in resolving the conflicts in the evidence, did not create a manifest miscarriage of justice so as to require a new trial.
 {¶ 101} Appellant's third assignment of error is overruled.
 {¶ 102} For the foregoing reasons, the sentence of the Court of Common Pleas of Stark County, Ohio, is hereby affirmed.
Gwin, J., Wise, P.J., and Boggins, J., concur
 JUDGMENT ENTRY
For the reasons stated in our accompanying Memorandum-Opinion, the sentence of the Court of Common Pleas of Stark County, Ohio, is hereby affirmed. Costs to appellant.