[Cite as *State v. Gillispie*, 2012-Ohio-1656.]

[Please see decision and entry at 2012-Ohio-2942.]

# IN THE COURT OF APPEALS OF OHIO
## SECOND APPELLATE DISTRICT
### MONTGOMERY COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | Appellate Case No. 24456 |
| Plaintiff-Appellee | : | |
| | : | Trial Court Case No. 90-CR-2667 |
| v. | : | |
| | : | |
| ROGER DEAN GILLISPIE | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellant | : | : |

. . . . . . . . . . .

## O P I N I O N

Rendered on the 13th day of April, 2012.

. . . . . . . . . . .

MATHIAS H. HECK, JR., by CARLEY J. INGRAM, Atty. Reg. #0020084, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, P.O. Box 972, 301 West Third Street, Dayton, Ohio 45422
      Attorney for Plaintiff-Appellee

JIM PETRO, Atty. Reg. #0022096, 1933 Lake Shore Drive, Columbus, Ohio 43204
and
MARK GODSEY, Atty. Reg. #0074484, Ohio Innocence Project, University of Cincinnati College of Law, Post Office Box 210040, Cincinnati, Ohio 45221
      Attorneys for Defendant-Appellant

. . . . . . . . . . . .

FAIN, J.

{¶ 1} Defendant-appellant Roger Gillispie appeals from an order of the trial court denying his motion for a new trial. He contends that the trial court abused its discretion both

in holding that newly discovered evidence regarding an alternative suspect is inadmissible hearsay, and in finding that the evidence is not material to Gillispie's defense. We conclude that the newly discovered evidence is not hearsay because it is not offered for the truth of the matter asserted, and the evidence is material to Gillispie's defense. We also conclude that the newly discovered evidence has a strong probability of changing the outcome of a new trial. Accordingly, the order of the trial court denying Gillispie's motion for a new trial is Reversed, and this cause is Remanded for a new trial.

I

{¶ 2} Between 3:00 and 4:00 p.m. on the afternoon of Friday, August 5, 1988, a man entered the front passenger door of S.C.'s car as she was leaving a store parking lot in Harrison Township, Ohio. Pointing a chrome handgun at S.C., the man forced her to drive behind a vacant building in the shopping center. Once parked, the man exposed himself, fondled S.C.'s breasts, and forced her to perform oral sex. When the man got out of the car and ordered S.C. out, she grabbed her keys from under the seat where the man had thrown them, and drove away.

{¶ 3} Shortly after 7:00 p.m. on Saturday, August 20, 1988, B.W. and C.W. were getting into their car in the parking lot of a Miami Township shopping center, when a man pushed his way into the back seat, claiming that he was store security and demanding to see their purses. Pointing a chrome handgun at the women, the man forced them to drive to a secluded area and to get out of the car. The man then exposed himself, fondled the women's breasts, and forced each of them to perform oral sex on him. The man blindfolded the women and drove them back to the parking lot from which he had abducted them. Before

leaving the car, the man stole money, a lighter, and a pack of cigarettes.

{¶ 4} B.W. and C.W. reported the rapes to their parents, who called the Miami Township Police. Upon learning of the attacks on B.W. and C.W., S.C. reported her rape to the police. Detective Gary Bailey was assigned to investigate the cases. The three women described their attacker as being talkative, though none of them noticed any kind of accent. The man identified himself as a security guard named Roger, who claimed to have been sexually abused by a relative when he was about twelve years old. During both attacks, the man lit a cigarette and said that he needed a ride to Columbus, Ohio.

{¶ 5} S.C. described her attacker as 6 feet tall and 200 pounds, with a stocky build. He had short, light brown or dark blonde hair, a mustache, light blue eyes, a tanned face, and a strong odor of cologne; she saw that he wore a gold chain with a medallion, but she did not notice whether he had a hairy chest. S.C. assisted police in compiling a composite sketch of her attacker.

{¶ 6} B.W. and C.W. described their attacker as being in his early 20's, over 6 feet tall, and weighing 250 pounds, with light reddish-brown hair that was short on top and over the ears, but longer in the back. Both women stated that their attacker did not have any gray hair. The man had a mustache and a wide, darkly tanned face. The man spoke in a low, authoritative voice and wore sunglasses. Neither woman noticed that he had a hairy chest. The man said that he was from both Columbus, Ohio and Corpus Christi, Texas, and he claimed to make a living by killing people for $1,000. C.W. also noticed that their attacker had bushy eyebrows and acne blemishes along his jaw. B.W. and C.W. assisted the police in putting together a composite sketch of their attacker. Their composite was similar to the one compiled by S.C.

{¶ 7} Detective Bailey and his supervisor, former Sergeant Steven Fritz, believed that the same man had raped all three women. When one of the sketches was publicized, a security supervisor at General Motors (GM) saw it and told the chief of GM plant security that the sketch resembled Gillispie. It appears that the police were not notified at that time. The police followed up on more than 20 leads, and many of those individuals came close to resembling the victims' descriptions of their attacker. However, because the police felt that no "suitable" suspects had been identified, no photo-spread was put together, and the investigation stalled.

{¶ 8} About a year later, the GM security supervisor told the new chief of plant security, Richard Wolfe, that the composite sketch resembled Gillispie. Wolfe and other GM security personnel spoke with Bailey and Fritz and provided them with a copy of Gillispie's photo identification card. Wolfe later made several calls to Fritz asking what was going to be done about Gillispie, and in due course, Fritz explained that after further investigation, they had eliminated Gillispie as a suspect.

{¶ 9} Fritz explained that he and Bailey "eliminated Gillispie as a suspect because of the extreme differences in Gillispie's physical appearance compared to that of the rapist, and because Gillispie, with a solid job and clean record, did not fit the profile of the brazen rapist in this case. Also, Wolfe's tip was suspicious. The WANTED poster for the case had been posted for nearly 2 years at the GM plant, but Wolfe waited until he had a nasty fight with Gillispie, and fired him, before suddenly deciding that he should turn in Gillispie as a suspect. Wolfe had no credible explanation for why Gillispie should be a suspect, other than the fact that Wolfe simply hated Gillispie for work-related reasons. As tips go, the one from Wolfe regarding Roger Dean Gillispie was a particularly unreliable one."

{¶ 10} Bailey provided much of the same information as Fritz regarding the investigation of Gillispie and their elimination of him as a suspect. Furthermore, Bailey noted discrepancies between the pants size noted by one of the victims when the rapist dropped his pants and differences between Gillispie's build and the victims' descriptions of their attacker.

{¶ 11} In June of 1990, Detective Scott Moore took over the investigation. A couple of months earlier, Wolfe had provided photo identification cards of five GM employees, including Gillispie, all of whom he believed resembled the composite sketch. Moore compiled a photo-spread of six photographs. The spread included the photo of Gillispie, but did not include photos of any of the four other GM employees. Moore contacted B.W. and C.W., both of whom separately and independently identified Gillispie as their attacker from the photo-spread. About six weeks later, Moore contacted S.C., who also identified Gillispie as her attacker. No other individuals were investigated as potential suspects by Moore.

{¶ 12} Gillispie spoke briefly with Moore about the rapes. Gillispie denied any knowledge of the attacks. Moore felt that the interview was "going nowhere" and ended the interview not long after it began.

{¶ 13} Moore obtained a search warrant for Gillispie's home. Although all three victims had given descriptions of their attacker's clothing and shoes, Moore did not recover any clothing or shoes matching the descriptions given by the three victims. Nor did he find any jewelry, sunglasses, belts, cigarettes, handguns, or other evidence.

{¶ 14} As a result of the identifications, Gillispie was indicted on nine counts of Rape, three counts of Kidnapping, three counts of Aggravated Robbery, and three counts of Gross

Sexual Imposition. All counts, except those of GSI, included firearm specifications. Following a jury trial in February, 1991, Gillispie was convicted of all counts and specifications, with the exception of two of the Aggravated Robbery counts.

{¶ 15} Shortly after trial, but before sentencing, one pubic hair and seven head hairs that had been recovered from B.W. and C.W.'s clothing were found at the Miami Valley Regional Crime Lab (MVRCL). Microscopic testing revealed that none of the hairs belonged to Gillispie. As a result of the new evidence, Gillispie sought and was granted a new trial.

{¶ 16} Gillispie was re-tried by a jury in June, 1991. Gillispie testified, and he called numerous witnesses to testify on his behalf, many of whom testified to his trustworthy and honest nature. Primarily, Gillispie argued that the women were mistaken in their identification of him as their attacker.

{¶ 17} Gillispie's witnesses agreed that Gillispie naturally has dark brown hair and that he started to go gray at the temples in the early 1980's while still in high school. He does not color his hair, and his hair does not noticeably lighten or turn reddish in the sun. The witnesses testified that Gillispie burns and blisters easily; he does not tan well. Gillispie has an extreme dislike for cigarettes, and because Gillispie has a hairy chest, he does not wear jewelry around his neck. Gillispie rarely wears a belt, other than with his work uniform. None of the witnesses ever saw Gillispie with a handgun. Since Gillispie's father is named Roger, Gillispie has always been called by his middle name, Dean. Gillispie does not have acne along his jaw. Several witnesses did note the cleft in Gillispie's chin, a characteristic not mentioned by any of the three victims in regard to their attacker.

{¶ 18} Gillispie also offered partial alibis for the dates of the rapes. Several witnesses testified that during the summer of 1988, Gillispie spent at least every other weekend boating in Kentucky with Brian Otis Poulter and Jerry Fyffe. Generally, the men would head to Kentucky early on Friday afternoon, and they would return late on Sunday afternoon or early on Sunday evening. On the weekend that C.W. and B.W. were raped, the men went boating. Gillispie's alibi witnesses testified that they remembered that particular weekend because Fyffe's father had noted on his calendar that one of his foxhounds had birthed a litter of puppies. It was a very hot weekend, and when the men got home at about 3:00 p.m., they carried the dog and her puppies into the basement of Fyffe's home to keep them cool and then unpacked their gear.

{¶ 19} On the day that S.C. was raped, Gillispie claims to have spent the afternoon driving around with Poulter in Poulter's new convertible. At about 6:00 p.m., they ended up at the home of Lisa Pittman, who invited the men back to her house for a party the following night. The witnesses testified that they remembered the weekend because another friend, Marie Woods, had noted Pittman's party on her calendar.

{¶ 20} Gillispie was convicted of all counts and specifications, and he was sentenced to a total of not less than 22 years, but not more than 56 years, in prison. Gillispie moved for a judgment of acquittal and for a new trial, and he filed a separate motion for a new trial. The trial court overruled the motions, and in a consolidated appeal, we affirmed Gillispie's conviction and sentence, as well as the denial of his motions for a new trial. *State v. Gillispie*, 2d Dist. Montgomery Nos. 12941 & 13585, 1993 WL 10927, (*Gillispie I*). Three years after his conviction, Gillispie filed his first petition for post-conviction relief, which the trial court denied. We affirmed the trial court's denial of Gillispie's petition. *State v.*

*Gillispie*, 2d Dist. Montgomery No. 14595, 1995 WL 41334, (*Gillispie II).*

{¶ 21} In 1996, and again in 1997, Gillispie requested that the trial court order the State to preserve the hairs that had been recovered from B.W. and C.W.'s clothing. The trial court ordered that the samples be preserved. Gillispie then successfully sought permission to have his own DNA expert test the hairs. When the State did not promptly release the samples to his expert, Gillispie sought an order requiring the State to do so. The State objected, and Gillispie explained that while the hairs had already been found not to be his own, he hoped that DNA testing could link the hairs to a potential suspect.

{¶ 22} In 1998, Gillispie filed a motion for a new trial, arguing that if the DNA testing demonstrated that the potential suspect was the source of any of the hair samples, he was entitled to a new trial. The trial court denied Gillispie's motion for a new trial but did grant his request for DNA testing at his family's expense. Two years later, when an employee at the MVRCL opened, reinventoried, and resealed the State's exhibit containing the hairs, in anticipation of releasing the exhibit to Gillispie's expert, the employee found that two of the head hairs were missing. Gillespie sought to have the State held in contempt for failing to preserve the evidence; he also requested a new trial based on the loss of evidence. The trial court overruled the motions, and we affirmed the trial court's decision. *State v. Gillispie,* 2d Dist. Montgomery No. 18852, 2002-Ohio-1774 (*Gillispie III*).

{¶ 23} In 2003, Gillispie requested that mitochondrial DNA testing be performed on the remaining hairs, at his own expense. The testing was allowed, and it revealed that all of the hairs belonged to either B.W. or C.W. The following year, Gillispie filed an application for post-conviction DNA testing of various other items of evidence. The State opposed the motion, and the trial court denied it.

{¶ 24} In 2008, Gillispie filed a second petition for post-conviction relief or, in the alternative, a motion for a new trial. He argued that new evidence, which fell into three broad categories, had come to light, to wit: (1) evidence of police corruption, perjury, witness tampering, and other official misconduct by Detective Moore; (2) additional evidence that an alternative perpetrator, Kevin Cobb, had committed the offenses; and (3) new scientific understanding in the field of eyewitness identification demonstrating that the eyewitness identification process in this case was flawed. The State opposed both Gillispie's petition and his motion for a new trial. The trial court granted summary judgment in favor of the State on the petition for post-conviction relief and denied the motion for a new trial.

{¶ 25} Gillispie appealed. We concluded that Gillispie presented sufficient new evidence regarding Cobb, the alternative perpetrator, to warrant a hearing in order to determine whether he is entitled to a new trial under Crim.R. 33. *State v. Gillispie,* 2d Dist. Montgomery Nos. 22877, 22912, 2009-Ohio-3640 (*Gillispie IV),* ¶ 138. That new evidence consisted primarily of the following: (1) Cobb has used the name Roger; (2) Cobb's voice is distinctively authoritative; (3) Cobb has bragged about working for the CIA as a contract killer; (4) Cobb asked how the "ladies" had described their assailant although he had not been told that there were multiple rape victims; and (5) three photographs of Cobb, including one from 1990, are similar to the composite sketches and to the victims' descriptions of their attacker. Id. Additionally, "[a]lthough we concluded that the trial court did not abuse its discretion when it found that the new expert testimony regarding eyewitness identification did not, by itself, warrant a new trial, the trial court, upon remand, may consider the effect that such testimony might have in conjunction with any new evidence regarding Cobb." Id. at ¶ 154.

{¶ 26} On remand, the trial court conducted a hearing on Gillispie's motion for a new trial and concluded that most of the newly discovered evidence is inadmissible hearsay. The court further found that none of the evidence is relevant because it is too remote in time, it is not directly related to the crimes, and it does not prove or disprove any material fact. Therefore, the court denied Gillispie's motion for a new trial. From the order denying his motion for a new trial, Gillispie appeals.

{¶ 27} During the pendency of this appeal, the United States District Court for the Southern District of Ohio has granted Gillispie a writ of habeas corpus ordering that he be released from custody unless he is retried and convicted. *Gillispie v. Timmerman-Cooper*, S.D. Ohio No. 3:09-cv-471, 2011 WL 6258450 (December 15, 2011). The ground for that relief was a holding that the State's failure to have informed Gillispie that he had been eliminated as a suspect by the police officers who initially investigated the rapes constituted a violation of his rights under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). We rejected a similar argument in *Gillispie IV*, at ¶ 101-105.

{¶ 28} Of course, if Gillispie is either retried or released as a result of the federal habeas corpus proceeding, that will render this appeal moot. But the relief ordered by the federal court is subject to appeal to the United States Court of Appeals for the Sixth Circuit, which is likely to take substantial time to resolve. In the meantime, it is incumbent upon us to resolve the issues raised in this appeal.

II

{¶ 29} Gillispie's First and Second assignments of error are as follows:

THE TRIAL COURT FUNDAMENTALLY MISAPPLIED THE HEARSAY RULE, AND ERRED WHEN IT RULED THAT STATEMENTS WERE HEARSAY EVEN THOUGH THEY WERE NOT OFFERED FOR THE TRUTH OF THE MATTER ASSERTED.

THE TRIAL COURT ERRED IN RULING THAT THE EVIDENCE PRESENTED BY GILLISPIE AT THE HEARING DOES NOT ENTITLE HIM TO A NEW TRIAL ON THE GROUNDS THAT THE EVIDENCE IS NOT RELEVANT AND DOES NOT CREATE A 'NEXUS' BETWEEN COBB AND THE CRIMES IN THIS CASE.

{¶ 30} In his First Assignment of Error, Gillispie contends that the trial court abused its discretion in holding that the newly discovered evidence regarding Kevin Cobb as an alternative suspect is inadmissible hearsay.  In his Second Assignment of Error, Gillispie maintains that the trial court abused its discretion in finding that the evidence is insufficient to warrant a new trial because it fails to create a nexus between the alternative suspect and the crimes of which Gillispie was convicted and because the evidence is not material to Gillispie's defense.

{¶ 31} A trial court's decision on a Crim.R. 33 motion for a new trial will not be reversed absent an abuse of discretion.  *State v. Schiebel*, 55 Ohio St.3d 71, 564 N.E.2d 54 (1990), paragraph one of the syllabus; *State v. Matthews*, 81 Ohio St.3d 375, 378, 1998-Ohio-433, 691 N.E.2d 1041.

{¶ 32} Generally, "when a determination has been confided to the discretion of a trial court, a reviewing court must give some deference to the trial court's determination.

[However,] [t]he extent of that deference is situationally dependent." *State v. Beavers,* 2d Dist. Montgomery No. 22588, 2009-Ohio-5604, ¶ 24. In part, the extent of the deference to be accorded to a trial court's determination depends on the amount of guidance informing the determination that is available from a higher authority, in the form of case law or statutory authority. Id.

{¶ 33} Here, the teachings of *State v. Petro*, 148 Ohio St. 505, 76 N.E.2d 370 (1947), and the numerous cases that followed *Petro,* provide significant guidance for a trial court's decision whether to grant a defendant's motion for a new trial based on newly discovered evidence; the decision whether to grant a new trial is therefore not made in a jurisprudential vacuum. *Beavers,* at ¶ 25. "Where a case has been tried to a jury, a motion for a new trial requires the court to determine whether it is likely that the jury would have reached a different verdict had it considered the newly discovered evidence. The task of the reviewing court is to then determine whether the trial court abused its discretion in making that determination." Id. at ¶ 26, citing *Dayton v. Martin*, 43 Ohio App.3d 87, 539 N.E.2d 646 (1987).

{¶ 34} "To warrant the granting of a motion for a new trial in a criminal case, based on the ground of newly discovered evidence, it must be shown that the new evidence (1) discloses a strong probability that it will change the result if a new trial is granted, (2) has been discovered since the trial, (3) is such as could not in the exercise of due diligence have been discovered before the trial, (4) is material to the issues, (5) is not merely cumulative to former evidence, and (6) does not merely impeach or contradict the former evidence." *Petro,* at syllabus. See, also, Crim.R. 33(A)(6). This appeal centers around the first and fourth *Petro* requirements.

{¶ 35} While the granting of a new trial based on newly discovered evidence

obviously involves consideration of newly discovered evidence, the requirement that there be a strong probability of a different result less obviously requires consideration of the evidence adduced at trial. In general, the stronger the evidence of guilt adduced at trial, the stronger the newly discovered evidence would have to be in order to produce a strong probability of a different result. Conversely, the weaker the evidence of guilt at trial, the less compelling the newly discovered evidence would have to be in order to produce a strong probability of a different result. In view of the beyond-a-reasonable-doubt burden of proof, newly discovered evidence need not conclusively establish a defendant's innocence in order to create a strong probability that a jury in a new trial would find reasonable doubt.

{¶ 36} This case does not involve overwhelming evidence of Gillispie's guilt. There is no physical evidence connecting Gillispie to the rapes. The only evidence linking him to the crimes is the perpetrator's use of the name Roger and the victims' eyewitness identifications, which were made two years after the crimes were committed. The record further reveals that the jury deliberated long and hard, twice advising the trial court on the second day of deliberations that it was deadlocked, with eight of the twelve jurors in favor of acquittal. Only after a jury charge pursuant to *Allen v. United States*, 164 U.S. 492, 17 S.Ct.154, 41 L.Ed. 528 (1896), and *State v. Howard*, 42 Ohio St.3d 18, 537 N.E.2d 188 (1989), and several more hours of deliberation, did the jurors unanimously decide to convict Gillispie.

{¶ 37} Gillispie's defense at trial was two-fold. In part, he offered partial alibis for his whereabouts at the times of the rapes. Primarily, however, Gillispie argued that the victims were mistaken in their identifications of him as their attacker. Gillispie focused on the numerous discrepancies between the victims' descriptions and composite sketches of their

attacker and his actions, and Gillispie's own appearance and behaviors.

{¶ 38} Gillispie was aware of Cobb at the time of his trial. In fact, his attorney asked Detective Moore, without any objection from the State, whether there had been any investigation of Cobb, who fits the physical description of the rapist, and who had been arrested for a somewhat similar crime in Fairfield, Ohio. Moore testified that he was unfamiliar with Cobb and that Gillispie was the only lead he pursued, despite the fact that Moore had been provided with four other photographs of GM employees who bore some resemblance to the WANTED poster. Gillispie had no evidence to offer in support of Cobb as an alternative suspect at that time.

{¶ 39} " 'Whether rooted directly in the Due Process Clause of the Fourteenth Amendment or in the Compulsory Process or Confrontation Clauses of the Sixth Amendment, the Constitution guarantees criminal defendants "a meaningful opportunity to present a complete defense." ' " *Gillispie IV,* 2009-Ohio-3640, at ¶ 120, quoting *Crane v. Kentucky*, 476 U.S. 683, 689-690, 106 S.Ct. 2142, 90 L.Ed.2d 636 (1987), in turn quoting *California v. Trombetta*, 467 U.S. 479, 485, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984). " 'A complete defense' may include evidence of third-party guilt." Id., citing *Holmes v. South Carolina*, 547 U.S. 319, 126 S.Ct. 1727, 164 L.Ed.2d 503 (2006).

{¶ 40} Since his trial, Gillispie has discovered more information about the similarities between Cobb and the victims' descriptions of their rapist that would tend to increase the likelihood of a jury finding reasonable doubt that Gillispie was the perpetrator. The trial court found that the newly discovered evidence did not link Cobb to the rapes, but Gillispie need not prove that someone else committed the offense in order to establish reasonable doubt. " 'There is no requirement that the proffered evidence [of a third party's guilt] must

prove or even raise a strong probability that someone other than the defendant committed the offense. Rather, the evidence need only *tend to* create reasonable doubt that the defendant committed the offense.' " *State v. Walker,* 5th Dist. Stark No. 2005-CA-00286, 2006-Ohio-6240, ¶ 50, quoting *Johnson v. United States,* 552 A.2d 513, 516, (D.C. Cir. 1989) (emphasis in original).

{¶ 41} At trial, the jury was presented with evidence tending to cast doubt upon the accuracy of the victims' identifications. Gillispie and numerous other witnesses testified regarding Gillispie's features and habits – he tends to burn rather than tan; he refuses to wear necklaces because they tangle in the hair on his chest; he neither owns nor has been seen with a handgun; he rarely wears a belt; he does not have bushy eyebrows or acne along his jaw; he hates cigarettes; he speaks with a twang or drawl; he has always used his middle name Dean rather than his first name Roger, because that is also his father's name; and he has a noticeable cleft in his chin, which was not mentioned by any of the three victims.

{¶ 42} Additionally, Gillispie's counsel emphasized the undisputed evidence that Gillispie's hair is naturally dark brown, with progressively graying temples beginning in 1982. C.W. was asked about the discrepancy between her description of her attacker's hair as being light reddish-brown with no gray and the defendant's hair. C.W. acknowledged that Gillispie's hair did not look like that of her attacker. She explained that she and Detective Moore had discussed the likelihood that her attacker would color his hair in an effort to change his appearance, and so she assumed that Gillispie must have done so.

{¶ 43} Nevertheless, despite these discrepancies, the jury chose to credit – after significant debate and reports of being deadlocked – the identification testimony of the three victims over the testimony of Gillispie and his witnesses, and it is certainly within the

province of the jury to have done so. However, in light of all of the newly discovered evidence, considered cumulatively, regarding Cobb as an alternative perpetrator, which a jury might see as casting further doubt on the victims' identifications of Gillispie, we conclude that there is a strong probability that a jury would have reasonable doubt of Gillispie's guilt in a new trial at which the newly discovered evidence were presented.

{¶ 44} It appears that the evidence regarding Cobb as an alternative suspect began to be generated after retired Sergeant Fritz received an anonymous call from a man identifying himself as an employee at Lebanon Correctional Institute, who claimed that one of his co-workers named Cobb "did those rapes." Fritz confirmed that Cobb worked at Lebanon Correctional in 1988. When Fritz ran Cobb's criminal record, he learned that Cobb had been arrested by Fairfield, Ohio police in 1990, after he posed as a police officer and "arrested" a woman in a public parking lot where she had exposed her breasts. The victim's friend called the police immediately and was able to provide Cobb's license plate number. The police found the victim at Cobb's apartment before he had time to do more than handcuff her and push her to the floor.

{¶ 45} Pointing out the differences between the Fairfield crime and the crimes for which Gillispie has been convicted, the trial court found that the incident is not relevant to the rapes, and that the arrest would not be admissible at a new trial. We conclude that the trial court properly determined that this evidence would not be admissible under Evid. R. 404(B):

> **Other crimes, wrongs or acts.** Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of

mistake or accident.

{¶ 46} From police records and people who know Cobb, Fritz learned that Cobb's physical description resembles the composites and the descriptions given by the rape victims in Gillispie's case – a tall, young, darkly tanned man with light brown or dark blonde hair with a reddish tint, blue eyes, acne along the jaw line, and who was often seen wearing a gold chain and medallion in the late 1980's.

{¶ 47} One of Cobb's ex-girlfriends, Stephanie Walters, testified that Cobb has a distinctive, deep, authoritative voice, and he has a strong fetish for oral sex, often being unable to perform while having vaginal intercourse. The trial court illustrated that many people can use an authoritative voice when they choose, concluding that because there was no further description of what the victim meant by authoritative voice, and there was no direct comparison between Gillispie's voice and Cobb's, "it is just plain speculative for the Court or a jury to decide what the victim meant by the term." We conclude that the trial court erred in finding that this evidence has no material value. Should this evidence be offered at a new trial, it would fall within the province of the jury to determine what weight, if any, to give to that evidence.

{¶ 48} Fritz discovered that Cobb has family in both Columbus, Ohio, and Texas and that he frequented the Dayton Mall area, where the rapes had occurred, during the time period of the crimes. Both Cobb's former father-in-law and Walters relate that Cobb said he was molested when he was about ten or twelve years old, possibly by his father or grandfather. Additionally, Walters overheard Cobb telling others that he worked for the CIA as a contract killer.

{¶ 49} The trial court found that Cobb's claims of sexual abuse and working as a contract killer are not directly related to the crime, and they do not prove or disprove any material fact. But the evidence need not prove Cobb's guilt – it need only create reasonable doubt of Gillispie's guilt. *Walker,* 2006-Ohio-6240, at ¶ 50. Although Cobb's claims of having been sexually molested, and his claims of having worked as a contract killer were made several years after the rapes, we do not agree that these claims are of no evidentiary value. These are not the sort of statements that might be made by almost any individual, and they become more distinctive as a result of being combined in one person. The evidence is material when offered to illustrate that Cobb's claims are very similar to the claims made by the rapist to his three victims. The time that elapsed between the statements and the crimes go to the weight to be accorded to the evidence rather than to its admissibility.

{¶ 50} Some evidence links Cobb to the use of the name Roger. Cobb had a brother who committed suicide. Although two of Cobb's former girlfriends told Fritz that the brother's name was Roger, his name was actually LaVaughn. Cobb is known to imitate and make fun of a drug addict in his home town who is named Roger. On one occasion, Cobb used the name Roger when he flashed a badge and claimed to be a U.S. Marshall in order to get money from a pizza delivery driver. The trial court found that this testimony was not credible. The application of Crim.R. 33(A)(6) does contemplate at least some assessment of the credibility of newly discovered evidence. *Beavers,* 2009-Ohio-5604, at ¶ 27, citing *Martin,* 2005-Ohio-209. However, "[q]uestions of credibility are, of course, primarily for a jury to determine." Id. at ¶ 32, citing *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967). This evidence is material to Gillispie's defense, and a jury should decide what weight, if any, to give to this evidence.

{¶ 51} Defense investigator Bruce Keaton interviewed Cobb in 2003. Cobb denied the existence of his 1990 Fairfield arrest, and he claimed to be unfamiliar with the facts of Gillispie's case. However, Keaton opined that Cobb "seemed fascinated by and intensely interested in the case," and he repeatedly asked if the investigation was going to be re-opened. Cobb also asked Keaton how the "ladies" described their attacker, even though he had never been told that there had been more than one victim.

{¶ 52} To the extent that the trial court suggests that Cobb might have a logical explanation for his use of the word "ladies," this is conjecture. We conclude that any explanation that Cobb might offer goes to the weight or credibility of the evidence, not to its admissibility.

{¶ 53} The trial court found that much of the newly discovered evidence is inadmissible hearsay. For example, the court found that the evidence of Cobb's use of the name Roger and his claims to be from Columbus, Ohio, and Corpus Christi, Texas, are inadmissible hearsay. Similarly, the court found that the evidence that Cobb has claimed to have been sexually abused as a child and Walters' testimony that she heard Cobb telling others that he is a contract killer is hearsay.

{¶ 54} " 'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Evid.R. 801(C). See, also, *State v. Maurer* (1984), 15 Ohio St.3d 239, 262, 473 N.E.2d 768; *State v. LeMar*, 95 Ohio St.3d 181, 2002-Ohio-2128, 767 N.E.2d 166, ¶ 159. "A 'statement' is (1) an oral or written assertion or (2) nonverbal conduct of a person, if it is intended by the person as an assertion." Evid.R. 801(A). A statement offered to prove that the statement

was made, and not for its truth, is not hearsay. *Maurer,* at 262. (Citation omitted).

**{¶ 55}** Gillispie does not offer the newly discovered evidence in order to prove that Cobb's brother was named Roger, or to prove that Cobb is from either Columbus or Corpus Christi. Nor does Gillispie offer the evidence to prove that Cobb was sexually abused or that he is a contract killer. In fact, Gillispie concedes that, while he has no idea if Cobb was molested, none of the other claims are true. It is the fact that Cobb has made these claims, which are so similar to the statements made by the rapist to his victims, that is relevant, not the content of those claims. Therefore, we conclude that because none of this newly discovered evidence is being offered to prove truth of the matter asserted, the evidence is not inadmissible hearsay.

**{¶ 56}** Finally, we turn to the three photos of Cobb. The first photo is part of Cobb's 1990 Fairfield arrest record. The second photo is from the Ohio Bureau of Motor Vehicles, and was taken in the mid- to late-1990's. The third photo was taken in 1996, and is part of the arrest record for Cobb's robbery of a pizza delivery person. The trial court concluded that all three of the photographs are "too remote and of no real value or relevance." While the two photographs from the mid- to late- 1990's might be remote enough in time from the crimes to be of limited value, the 1990 photograph is close enough in time to be relevant to Gillispie's claim that Cobb bears a strong physical resemblance to the perpetrator described by the three victims. Again, the weight, if any, to be given to this evidence is primarily for the jury to determine.

**{¶ 57}** In light of the jury's initial hesitation to convict Gillispie based solely upon the victims' identifications, as evidenced by the jury's claims to be deadlocked, we conclude that when the evidence at trial is supplemented with all of the newly discovered evidence,

considered cumulatively, regarding Cobb as the possible perpetrator of these rapes, there is a strong probability that a jury at a new trial would find reasonable doubt, and acquit Gillispie.

{¶ 58} Furthermore, the newly discovered evidence, considered cumulatively, may be of even greater significance to a jury when considered in light of studies regarding eyewitness identification testimony that have been conducted in the years since Gillispie's trial, as testified to by Dr. Steven Clark.   In *Gillispie IV,* we stated, "[a]lthough we concluded that the trial court did not abuse its discretion when it found that the new expert testimony regarding eyewitness identification did not, by itself, warrant a new trial, the trial court, upon remand, may consider the effect that such testimony might have in conjunction with any new evidence regarding Cobb."   2009-Ohio-3640, at ¶ 154.

{¶ 59} In conclusion, we find that the trial court acted beyond its discretion in holding that the newly discovered evidence is hearsay and that the evidence is not material to Gillispie's defense.   As in any criminal case, a jury would not have to find that Gillispie is innocent of the rapes, or that Cobb is guilty of the rapes; to reach a result different from the previous trial, the jury would only have to find the existence of reasonable doubt that Gillispie is the rapist.   We conclude that the newly discovered evidence creates a strong probability that the jury would reach a different conclusion if the newly discovered evidence were before it.

{¶ 60} Both of Gillispie's assignments of error are sustained.


IV

{¶ 61} Both of Gillispie's assignments of error having been sustained, the order of the

trial court denying Gillispie's motion for a new trial is Reversed. Gillispie's conviction and sentences are Vacated, and this cause is Remanded for a new trial.

. . . . . . . . . . . . .

GRADY, P.J., concurring:

{¶ 62} I agree that whether new evidence "discloses a strong probability that it will change the result if a new trial is granted," *State v. Petro*, 148 Ohio St. 505, 76 N.E.2d 370 (1947), syllabus, necessarily requires consideration of the evidence that was adduced at trial and its weight.

{¶ 63} The only evidence linking Defendant to these crimes is the perpetrator's use of the name Roger and the testimony of the three victims identifying Defendant as the perpetrator. The latter is, by far, the more compelling. Indeed, absent that evidence a conviction would not have been possible.

{¶ 64} The testimony of the victims is eyewitness identification. Being victims, their testimony is highly likely to be credited by a jury. Indeed, to reject that testimony could be seen to compound the terrible wrongs the victims suffered, to "victimize the victim" as some might say. Nevertheless, as experience shows, the very nature of such wrongs has the capacity to distort a victim's powers of observation and ability to correctly identify the perpetrator, especially when that identification is made two years later.

{¶ 65} Recently, in *State of New Jersey v. Henderson,* 208 N.J. 208, 27 A.3d 872 (N.J. 2011), the Supreme Court of New Jersey wrote, at pp. 231-232:

> In 2006, this Court observed that eyewitness "[m]isidentification is

widely recognized as the single greatest cause of wrongful convictions in this country." *State v. Delgado*, 188 *N.J.* 48, 60 (2006) (citations omitted); *see also Romero, supra*, 191 *N.J.* at 73-74 ("Some have pronounced that mistaken identifications 'present what is conceivably the greatest single threat to the achievement of our ideal that no innocent man shall be punished.' " (citation omitted)). That same year, the International Association of Chiefs of Police published training guidelines in which it concluded that "[o]f all investigative procedures employed by police in criminal cases, probably none is less reliable than the eyewitness identification. Erroneous identifications create more injustice and cause more suffering to innocent persons than perhaps any other aspect of police work." Int'l Ass'n of Chiefs of Police, *Training Key No. 600, Eyewitness Identification* 5 (2006).

Substantial evidence in the record supports those statements. Nationwide, "more than seventy-five percent of convictions overturned due to DNA evidence involved eyewitness misidentification." *Romero, supra*, 191 *N.J.* at 74 (citing Innocence Project report); Brandon L. Garrett, *Convicting the Innocent: Where Criminal Prosecutions Go Wrong* 8-9, 279 (2011) (finding same in 190 of first 250 DNA exoneration cases). In half of the cases, eyewitness testimony was not corroborated by confessions, forensic science, or informants. See the Innocence Project, *Understand the Causes: Eyewitness Misidentification*, http://www.innocenceproject.org/understand/ Eyewitness-Misidentification.php (last visited August 16, 2011). Thirty-six percent of the defendants convicted were misidentified by more than one

eyewitness. Garrett, *supra*, at 50. As we recognized four years ago, "[i]t has been estimated that approximately 7,500 of every 1.5 million annual convictions for serious offenses may be based on misidentifications." *Romero, supra*, 191 *N.J.* at 74 (citing Brian L. Cutler & Steven D. Penrod, *Mistaken Identification: The Eyewitness, Psychology, and the Law* 7 (1995)). (Italics in original.)

**{¶ 66}** *Henderson* was specifically concerned with eyewitness identification that was influenced, for example, by police, but also by factors like lighting, the time that had elapsed since the crime, or whether the victim felt stress at the time of the identification. When a defendant presents such evidence to show possible misidentification, *Henderson* requires that a hearing be held to consider the effect of the factor or factors. If the identification evidence is admitted, the court must give detailed explanations to the jurors, even in the middle of a trial, concerning influences that could heighten the risk of misidentification.

**{¶ 67}** The holding in *Henderson* applies only to New Jersey. Further, nothing I have said should be taken to suggest that the victims were insincere or necessarily mistaken in their identifications of Defendant Gillispie. Nevertheless, in the context of the probability of a different result that *Petro* requires courts to find, the new evidence implicating another possible perpetrator could sufficiently weigh against the recollections of the victims that, on the reasonable doubt standard, a different outcome, an acquittal, is reasonably probable.

. . . . . . . . . . . . .

HALL, J., dissenting:

**{¶ 68}** Because I believe that the opinions of my colleagues are a substitution of their judgment for reasonable conclusions made by the trial court, I dissent.

{¶ 69} The two discrete issues in this appeal are whether the trial court abused its discretion in ruling that certain items of "new" evidence would not be admissible and therefore do not support a new trial, or whether the trial court abused its discretion by determining that there was no "strong probability" of a different result if a new trial was granted. In my view, even if I, or my colleagues, might come to a different conclusion on some aspects of the trial court's rulings, there was no abuse of discretion and no reason for reversal.

{¶ 70} The defendant was convicted of several counts of rape related to two separate incidents in August 1988. This court's previous decision, *State v. Gillispie*, 2d Dist. Montgomery Nos. 22877, 22912, 2009-Ohio-3640 (IV), and the hearing that followed, narrowed the scope of the defendant's new trial request to whether five areas of "new" evidence about the defense's alternate suspect, Kevin Cobb, warranted a new trial. Those five areas of new evidence involve: (1) Cobb's connection with the name "Roger," the name by which the rapist identified himself; (2) the distinctively authoritative nature of Cobb's voice; (3) Cobb's bragging that he was a contract killer for the CIA and that he "thought he was probably abused/molested by probably either a father or grandfather" (T. 22); (4) Cobb's reference to the rape victims as "ladies" when questioned by an investigator for the defendant who said he did not tell Cobb there were multiple victims; and (5) three photographs of Cobb over a period of years.[1]

{¶ 71} For any evidence to affect a new trial it must be heard by the jury. An

---

[1] In my view, much of this information is *not* newly discovered evidence to begin with. Cobb was known as an alternate suspect before Gillispie's second trial more than twenty years ago. Much of the "new" information could have been discovered through

overriding consideration is what threshold is necessary in order to admit evidence about an alternate suspect. Without question, the defendant is constitutionally guaranteed a meaningful opportunity to present a complete defense. *Crane v. Kentucky*, 476 U.S. 683, 690, 106 S.Ct. 2142, 2146, 90 L.Ed.2d 636 (1986). But the Constitution does not prevent trial judges from applying rules of evidence to exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury. *Holmes v. South Carolina*, 547 U.S. 319, 126 S.Ct. 1727, 164 L.Ed.2d 503 (2006). In that case, although the issue was not directly challenged by the parties, the Supreme Court cited with approval 40A Am.Jur.2d, Homicide Section 286, at 136–138 (1999): "[T]he accused may introduce any legal evidence tending to prove that another person may have committed the crime with which the defendant is charged . . . . [Such evidence] may be excluded where it does not sufficiently connect the other person to the crime, as, for example, where the evidence is speculative or remote, or does not tend to prove or disprove a material fact in issue at the defendant's trial." *Id.* at 327 (footnotes omitted).

{¶ 72}There is little discussion of the admission of alternate-suspect evidence in Ohio case law. However, in *State v. Miller*, 12th Dist. Butler No. CA2005-02-048, 2006-Ohio-2799, the appellate court stated: "Emphasizing that a nexus had to be presented in order for this third-party evidence to be admitted, the [trial] court referred to the defense's arguments as guess and speculation. The court thus deemed the evidence irrelevant * * *." *Id.* at ¶ 26. The court of appeals found no abuse of discretion by the trial court in excluding the alternate-suspect evidence.

the exercise of due diligence. Nevertheless, that issue is not presently before us.

{¶ 73} Several state and federal courts have expressed this concept as requiring that there be a nexus between alternate-suspect evidence and the offense. *See Wiley v. State*, 74 S.W.3d 399, 406 (Tex.Crim.App.2002) (reasoning that to be admitted, alleged alternative-perpetrator evidence must be sufficient, on its own or in combination with other evidence in the record, to show a nexus between the crime charged and the alternative perpetrator); *Bush v. State*, 2008 Wy. 108, 193 P.3d 203 (2008) (stating that alternate-suspect evidence must demonstrate a direct nexus between the alternate suspect and the crime charged to be admissible and that the evidence may properly be excluded where it is speculative and does nothing more than raise a suspicion); *State v. Condon*, 72 Wash.App. 638, 865 P.2d 521 (1993), review denied, 123 Wash.2d 1031, 877 P.2d 694 (1994) (concluding that evidence implicating another suspect is admissible only when the defense can establish a clear nexus between the third person and the crime); *Cikora v. Dugger*, 840 F.2d 893, 898 (11th Cir.1988) (finding no error in denying defendant the right to show jurors an individual who lived in the area of a burglary, and who met the description offered by witnesses, absent nexus between the individual and the charged crime). California formerly had a rule, developed by case law, that required "substantial evidence" to "directly connect" a third-party suspect before alternate-suspect evidence was admissible. The California Supreme court rejected that rule in *People v. Hall*, 41 Cal.3d 826, 834, 226 Cal.Rptr. 112, 718 P.2d 99 (1986), and instead indicated that the such evidence should be evaluated under traditional Evid.R. 403 (codified as Section 352 of the California Evidence Code) concepts. I would suggest that evaluating whether alternate-suspect evidence has a nexus to the offense on trial is part of the trial court's balancing of the interests at stake in an Evid.R. 403 determination. Accordingly, it was appropriate for the trial court to evaluate whether the defendant's new evidence would be

admissible and to include in that evaluation whether the evidence connected Kevin Cobb to the offenses and whether it was speculative or remote.

{¶ 74} Of the five categories of new evidence, the trial court determined that the first three would not be admissible at a retrial because there was no nexus linking Cobb to the rapes. I agree.[2] Beyond that, more detailed analysis of the new evidence demonstrates not only that the court was correct, but that its rulings were not an abuse of discretion.

*A. Use of the name "Roger"*

{¶ 75} There are three alleged "Roger" connections. With regard to the first, it simply escapes me how the testimony that Cobb may have referred to his deceased brother, LaVaughn, as "Roger" in 1999-2002 has any legal or logical relevance to support an inference that Cobb was the rapist who identified himself as Roger to the victims in 1988. That connection should be disregarded and inadmissible. The second connection, testimony that Cobb would mimic a "crazy" person named "Roger" in his hometown of Portsmouth, Ohio, likewise has no legal or logical relevance to allow an inference Cobb was the rapist who identified himself as Roger to the victims in 1988. This is particularly true when the witness who was asked about the imitation never knew Cobb to go by the name Roger. (T.313). That second connection should be disregarded and inadmissible. That leaves the only "Roger" connection that has any potential relevance—that Cobb may have used the name "Roger" for identifying himself when he tried to swindle a pizza delivery man at the Holiday Inn in Fairfield, Ohio in 1996. Notably, the delivery driver did not mention that the con man used the

_____

[2] I could be persuaded that Cobb's use of the name "Roger" when he tried to get money from a pizza driver in 1996 is relevant, and would be admissible,   if there was some other admissible evidence of Cobb's connection to the rapes. But there is not.

name "Roger" in his initial report to the police made  that night. He only remembered the "Roger" morsel fifteen years later when interviewed by an investigator for Gillispie.  Given the above "new evidence," I agree with the trial court that the "Roger" connections  "are not relevant in that they are remote in time, they are not directly related to the crime, and they do not prove or disprove any material fact at issue in this case. There is no nexus between the crime and these statements made seven and ten years later. * * * The evidence as presented must be excluded from a new trial and therefore, provides no basis for the granting of a new trial."  (December 29, 2010, Decision at 2-3).  More importantly, even if legitimate differences as to the trial court's decision might exist, the trial court's decision is reasonable and nowhere near an abuse of discretion.

### B. Authoritative voice

**{¶ 76}** Much argument has been made by the defense about the "new" evidence of Cobb's "authoritative" voice. The trial court was correct in deciding this evidence was insufficient to be admissible or to grant a new trial. An amorphous description that Cobb has an "authoritative" voice is not logically or legally relevant to support an inference that he was the rapist who demanded sex from the victims. I find it curious that in a case so keenly sensitive to the elusive qualities of eyewitness identification, one would argue that an "authoritative" voice, as opposed to a specifically unique and distinctively certain voice, could be used to infer identification of the alternate suspect. Nevertheless, I further agree with the trial court that "[w]ith no further description of the term 'authoritative' and no comparative basis for the two voices, it is just plain speculative for the court or a jury to decide what the victim meant by that term.* * *. The evidence as presented must be excluded from a new trial and therefore, provides no basis for the granting of a new trial." (*Id* at 3).  But even if my

conclusion whether to admit this evidence would differ from the trial court's, there is nothing unreasonable or incorrect about the trial court's conclusion and, therefore, no abuse of discretion to support reversal.

*C. A CIA contract killer and probably molested*

**{¶ 77}** During the simultaneous attack on the two women on August 28,1988, the rapist told the victims that his job was killing people for $1,000.00. At the new trial hearing below, Stephanie Walters, Kevin Cobb's on-and-off again girlfriend from 1999 to 2002, was asked about Cobb's behavior "when he would be out in public and in bars and drinking[.]" (T. 15). She heard him telling people that "he actually worked secretly for the CIA, that he was actually a contract killer for the CIA." (Id. at 16) First, the bravado claim of being a CIA operative or a contract killer, or both, is not uncommon late at night in many a tavern. Nonetheless, I agree with the trial court that "Cobb's bragging is not relevant in that it is remote in time, not directly related to the crime, and does not prove or disprove any material fact at issue in this case. There is no nexus between the crime and Cobb's statement ten years later. * * * The evidence as presented must be excluded from a new trial and therefore, provides no basis for the granting of a new trial."   (Decision at 4). But even if my conclusion whether to admit this evidence would differ from the trial court's, there is nothing unreasonable or incorrect about the trial court's conclusion and, therefore, no abuse of discretion to support reversal.

**{¶ 78}** A connection about the testimony of Cobb and the rapist having been molested as a child is likewise fragile. With regard to Cobb, his former girlfriend said "He did not remember exactly in our conversations. It was either a father or a grandfather. I don't think he remembered for certain." * * *"Probably around the age of ten to 12, somewhere in there" (T.

22). Contrast that to the testimony of the victims of the simultaneous assaults on August 20, 1998. The rapist said "* * *that he was raped when he was twelve by his grandfather and he had to live with that every day." (Second Trial Transcript Vol. II, pg. 371), and "* * *he said his grandfather raped him or molested him, something like that, when he was 12 years old* * * *." (Id at 449) The third victim recalled the rapist said something about being molested but she could not recall by whom (T. 510) and did not recall specifics of the statement (T. 525-26). The trial court's Decision overruling the motion for a new trial does not specifically address the childhood molestation evidence. But the court did indicate that it did review all of the exhibits and testimony and determined "* * * none of it to be connected to the crimes of August, 1988 and therefore not relevant or admissible in a new trial." Decision at 7. I agree. Moreover the amorphous testimony from Cobb's girlfriend is not sufficiently similar to the "raped when he was twelve by his grandfather" to create a nexus between Cobb and the offenses. In any event, I see no abuse of discretion.

*D. "How did the ladies describe him?" (T. 179)*

{¶ 79} I agree with the trial court that Cobb's above-quoted question to the defense investigator and defendant's counsel is pure hearsay. Cobb's plural "ladies" is introduced for the truth because if that word is not truly accurate, then there can be no inference that he knew more than he was telling. But just because it's hearsay if elicited from the investigator does not mean it would be entirely excluded. The defense could call Cobb to the stand and elicit the testimony directly from him. Of course, Cobb has denied involvement in the rapes so the defense would likely not risk calling him and must argue that the evidence should come in without Cobb as a witness. But if Cobb does testify and denies he made the statement, or pluralized the word "lady," the statement likely would not be admissible by extrinsic evidence

as a prior inconsistent statement and it would not be admissible as substantive evidence. Conversely, if Cobb admits he used the word "ladies," perhaps he could readily explain that his questioner asked him about the "crimes," plural, as the investigator testified on direct examination at the hearing, (T. 170 ) before a clarifying explanation was later given. Cobb might otherwise explain away the term. After all, this interview took place a couple years before the 2010 hearing, which means the interview was twenty years after the 1988 offenses.[3] Cobb may have heard about the case even though he denied that fact. This entire encounter would devolve into a mini-trial about what was said, who said it, whether Cobb was unduly inquisitive, or what was the accuracy of the investigator's interpretation, given his effort to seek proof Cobb was the alternate suspect. This anticipated collateral diversion alone is reason to rule that the entire encounter should be excluded. I agree with the trial court that "this statement stands alone with little probative value that is substantially outweighed by unfair prejudice to the State and misleading the jury. The evidence as presented must be excluded from a new trial and therefore, provides no basis for the granting of a new trial." (Decision at 5). Even if my conclusion whether to admit this evidence would differ from the trial court's, there is nothing unreasonable or incorrect about the trial court's conclusion and, therefore, no abuse of discretion to support reversal.

### E. Three photographs, minus two

{¶ 80} Of the three photos of Cobb the defense offers as new evidence, the lead opinion, correctly in my view, concludes that two of them are too remote in time to be

---

[3]It is almost beyond belief that this was the first and only time that anyone on behalf of the defendant ever interviewed Cobb, who had been their alternate suspect since at least before the second trial in June 1991.

admissible. Only the 1990 Fairfield arrest photo would be admissible.[4] I agree that the 1990 photo of Cobb should be admissible, if there was some other admissible evidence of Cobb's connection to the rapes. But there is not. Therefore, I would determine that the trial court did not abuse its discretion in excluding the photo.

*F. No Strong probability of a different result*

{¶ 81} There is no dispute that to obtain a new trial a defendant must present evidence to demonstrate a "strong probability" that it would "change the result" if a new trial was granted. *State v. Petro*, 148 Ohio St. 505, 76 N.E.2d 370 (1947), syllabus. My interpretation of the admissibility of the new evidence would, at best, only allow two pieces of evidence to be considered: that Cobb may have used the name Roger in 1996 and a photo of him from 1990 that bears a resemblance to the rapist. This evidence does not support finding a strong possibility of a different result. More importantly, it does not demonstrate that the trial court abused its discretion by denying a new trial. Thus, the decision of the trial court should be affirmed.

. . . . . . . . . . . .

Copies mailed to:

Mathias H. Heck
Carley J. Ingram
Jim Petro
Mark Godsey
Hon. Steven K. Dankof

---

[4]The lead opinion also, in my view, correctly concludes that the circumstances of the incident surrounding the 1990 Fairfield arrest are not admissible.